J-A12019-26                    2026 PA Super 157

IN THE INTEREST OF: J.H., A MINOR    :    IN THE SUPERIOR COURT OF
         :            PENNSYLVANIA
         :
APPEAL OF: J.H., MINOR        :
         :
         :
         :
         :
         :    No. 3235 EDA 2025

Appeal from the Dispositional Order November 7, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-JV-0000778-2023

IN THE INTEREST OF: J.H., A MINOR    :    IN THE SUPERIOR COURT OF
         :            PENNSYLVANIA
         :
APPEAL OF: J.H., MINOR        :
         :
         :
         :
         :
         :    No. 3236 EDA 2025

Appeal from the Dispositional Order November 7, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-JV-0001301-2023

BEFORE: LAZARUS, P.J., SULLIVAN, J., and STEVENS, P.J.E.[*]

OPINION BY LAZARUS, P.J.:             **FILED JULY 23, 2026**

J.H., a minor, appeals from the trial court's dispositional orders following his adjudication of delinquency for theft by unlawful taking[1] and conspiracy to commit theft by unlawful taking.[2] He challenges the trial court's adjudication

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3921(a).

[2] *Id.* at § 903.

of delinquency on due process grounds, as well as the court's disposition committing him to out-of-home placement. Upon careful review, we vacate and remand for further proceedings consistent with this opinion.

On May 10, 2023, the Commonwealth filed a delinquency petition charging J.H., then aged 12, with, *inter alia*, the above-cited offenses, both third-degree felonies. At an adjudicatory hearing on March 27, 2024, J.H. entered an admission to these two offenses, and all other counts were withdrawn. **See** N.T. Adjudicatory Hearing, 3/27/24, at 3–5; Adjudicatory/Dispositional Order, 3/27/24. The trial court deferred adjudication and placed J.H. on interim probation, with restitution left open. **See** N.T. Adjudicatory Hearing, 3/27/24, at 5, 7; Adjudicatory/Dispositional Order, 3/27/24.

J.H.'s probation officer filed a motion to review J.H.'s probation conditions on May 3, 2024, citing a decreased level of compliance, difficulty reaching J.H. as he moved between different houses, and failure to enroll in school. **See** Probation Officer Motion, 5/3/24, at 2 (unpaginated). When J.H. failed to appear at a hearing on the motion on May 6, 2024, the trial court issued a bench warrant, which was lifted when J.H. was apprehended on June 24, 2024. On July 11, 2024, the court released J.H. to his mother's home in New Jersey with courtesy supervision and placed him on GPS monitoring, with house restrictions. **See** Adjudicatory/Dispositional Order, 7/11/24. After a review hearing in September 2024, the court ordered that the GPS monitoring could be discharged if J.H. provided school information. **Id.**, 9/13/24. On

- 2 -

October 15, 2024, at a subsequent review hearing, the court discharged J.H.'s GPS monitoring, retroactive to September 25, 2024. *Id.*, 10/15/24. The court held hearings on January 31, 2025 and March 3, 2025, with no documented changes in the terms of J.H.'s supervision. At the March 3, 2025 hearing, the court ordered that J.H.'s presence could be waived for the next listing if "all [wa]s well." *Id.*, 3/3/25.

J.H.'s probation officer filed a motion on May 6, 2025, requesting review of J.H.'s probation conditions, because J.H. reportedly absconded in April 2025, and his whereabouts were unknown. *See* Probation Officer Motion, 5/6/25, at 2 (unpaginated). At a May 12, 2025 hearing on the motion, the trial court issued a bench warrant because J.H. failed to appear. The court lifted the bench warrant when J.H. was apprehended on November 3, 2025.

On November 7, 2025, the trial court held an adjudicatory/dispositional hearing, which resulted in the order on appeal in the instant matter. Immediately after the parties put their names on the record, the court directly addressed J.H., asking where he had been for the past year.[3] *See* N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 3. J.H. responded that he was "trying to stay out of trouble and help[ his] grandmom clean her backyard."

---

[3] From the record, it appears that J.H.'s whereabouts were unknown from April 20, 2025 until November 3, 2025, just less than six months, rather than one year, as the trial court stated. *See* Adjudicatory/Dispositional Order, 3/3/25; *id.*, 5/12/25; Pre-Adjudicatory Detention/Shelter Care Hearing Order, 11/3/25; Probation Officer Motion, 5/6/25. While J.H. absconded twice before the most recent bench warrant, only about one month of that time was during the prior year; the rest of the time, he was with his mother. *See* Adjudicatory/Dispositional Order, 5/6/24; *id.*, 6/24/24; *id.*, 7/11/24.

*Id.* at 3–4. The court then asked J.H. where he was picked up by authorities,

leading to the following exchange:

> [J.H.]: They picked me up on Kensington and, I think, Clearfield.
>
> THE COURT: Kensington and Whitaker?
>
> [J.H.]: No, Kensington and Clearfield.
>
> THE COURT: So, you're right in the heart of where drug activity is 24 hours a minute, 24 hours a day. It's drug activity everywhere on that corner.
>
> What are you doing back in Philadelphia when your whereabouts were unknown?
>
> [J.H.]: Because I had came back to celebrate a holiday with my grandmom and my—
>
> THE COURT: [R]ight there in the middle of Kensington and Clearfield?
>
> [J.H.]: No, I had—when I came to celebrate, I had went to my grandmom's house, which is near—
>
> THE COURT: Then how did you get picked up at Kensington and Clearfield?
>
> [J.H.]: Because we was walking, and the cops had came and they just said they was grabbing us for investigation or something.

*Id.* at 4–5. The court said to J.H., "So, you weren't going to turn yourself in

at all, were you?" *Id.* at 5. J.H. said he planned to turn himself in, but was

trying to wait for his mother, who was in New York, to return. *Id.* The court,

noting it previously "sent [his] case to New Jersey," asked whether J.H. was

living in New Jersey. *Id.* Counsel for J.H. asked, "Your Honor, if I may?" *Id.*

The court responded:

> THE COURT: No. You're not going to say ["]if I may.["] He's dancing around, trying to get out of here, but he's not. He's going to boot camp six to nine months.

- 4 -

[COUNSEL FOR J.H.]: Judge?

THE COURT: No. First of all, he'll be adjudicated delinquent. Get the form.[4] He'll be adjudicated delinquent, then secondly, I'm sending you away because you come to Philadelphia whenever you want.

You hang on drug corners.

*Id.* at 5–6. Counsel for J.H. responded that "there was contact with the probation officer. [J.H.] has been in Philadelphia." *Id.* at 6. The court asked counsel why J.H. did not turn himself in, and, when counsel for J.H. acknowledged he had not done so, the court stated, "This is a no-argue room."

*See id.* Counsel for J.H. and the court then had the following exchange:

[COUNSEL FOR J.H.]: He had to leave the home that he was in because he no longer felt safe there in New Jersey.

He has been living with his family. His family is here.

THE COURT: Fill the forms out, counsel. I'm directing you to fill the forms out right now.

[COUNSEL FOR J.H.]: Your Honor, we're all in agreement. As far as the probation officer, I would just ask that you hear the probation officer.

THE COURT: Fill the form out. He'll be adjudicated delinquent.

[COUNSEL FOR J.H.]: Your Honor, he was 12 at the time of the alleged incident.

THE COURT: So, he steals two cars and that's allowed?

[COUNSEL FOR J.H.]: No, Your Honor, I'm simply—

THE COURT: Then fill out the form.

[COUNSEL FOR J.H.]: I would just ask to be heard.

---

[4] We presume the trial court refers to the post-dispositional colloquy form, which details the juvenile's rights after adjudication and disposition and is to be provided to the juvenile pursuant to Pa.R.J.C.P. 512(C).

THE COURT:  Fill out the form.

*Id.* at 6–7.

The court then turned to the probation officer, Officer Delina Adams, and asked where J.H. had been for the past year and a half.[5]  *Id.*  Officer Adams said J.H. was living with his grandmother in Philadelphia.  *Id.* at 8.  The court asked why J.H. had not turned himself in, and when Officer Adams responded, "That is unknown," the court said, "Then he's going away.  All right."  *Id.*  Counsel for J.H. again noted this was J.H.'s only arrest, and the court told her to "[s]top minimizing."  *Id.*

The attorney for the Commonwealth interjected, saying, "Your Honor, if I may?"  *Id.*  The court allowed her to speak:

> [THE COMMONWEALTH]:  We're respectful of [t]he [c]ourt's decision for adjudication.  We would request that, Your Honor, for the PO's recommendation on him not going to placement at this time—
>
> THE COURT:  He hasn't paid a dime for his restitution for your complaining witness, which is close to $600.[00].  All he does is run around, go to Kensington whenever he wishes and comes back home, and he stays over there.
>
> He probably hasn't gone to school.  [Officer] Adams, do you have the school report?

*Id.* at 8–9.  Officer Adams indicated there was no school report, because J.H. was not currently enrolled.  *Id.* at 9.  The court immediately asked J.H.'s counsel, "Is that form filled out?"  *Id.*  Counsel said she was filling it out.  *Id.*  Officer Adams, however, interjected, saying, "Your Honor, if I may though?"

---

[5] *See supra* note 3 (J.H. only missing from mother's home for just under six months).

*Id.* The court said, "No. No, you may not. He's not going to school. He's 15. He can't read or write. He can't do numbers. He does not attend school." *Id.* Counsel for J.H. asked whether the court wanted her to colloquy J.H., and the court responded, "No. You go over it with him. You go line by line because he doesn't attend school, probably can't read or write. So, you must go over it with him right here." *Id.*

The court asked Officer Adams where J.H. was supposed to attend school. Officer Adams explained J.H. previously attended school in New Jersey but had not gone since he absconded. *See id.* at 10. The court asked, "So, he hasn't been to school since October 2024?" *Id.* Officer Adams responded, "Well, 2025, because that's when he disappeared. He technically disappeared November of 2024, correct." *Id.* J.H.'s attorney said, "Your Honor, considering that those were his only arrests at the age of 12, I'm not excusing that he's not in school—", and the court interjected, "Excuse me, I'm sorry. Do you understand he can't read or write, that you have to do the forms for him; do you understand that? Finish the form." *Id.* at 11.

The court suggested sending J.H. to Youth Forestry Camp. *Id.* at 12–13. Then, however, the court began to question J.H. again, asking him how he got to Kensington. *See id.* at 13. J.H. said he went on his electric bike, and the court asked whether he drove it across the bridge. *See id.* J.H. said he did not, and J.H.'s attorney reiterated, "Your Honor, he's been living at his aunt and grandmother's house in Philadelphia since he fled the New Jersey home." *Id.*

The court then turned its attention to Officer Adams, asking whether Officer Adams knew J.H. was in Philadelphia. *See id.* Officer Adams said she knew generally that J.H. was in Philadelphia but did not know the exact location. *See id.* at 14.

The court ordered J.H. be placed in a residential facility, which it characterized as the least-restrictive placement consistent with the protection of the public and best-suited to J.H.'s treatment, supervision, rehabilitation, and welfare. *See id.* The court cited J.H.'s runaway status, the fact that "[t]hey've been keeping [J.H.] in Philadelphia illegally," the circumstances of his offense, the fact that he was not in school, and his outstanding restitution as its justifications for placement. *See id.* at 14–15.

Counsel for the juvenile asked the court to reconsider its disposition in light of J.H.'s compliance on probation before he disappeared. *See id.* at 15. The court said it was only five months of compliance and added, "[A]t the age of 12 and a half, 13, stealing cars in Philadelphia and he lives in New Jersey. Why is it this New Jersey person has to come to Philadelphia and steal our cars?[6] Why?" *See id.* The court continued, "Now he's roaming around on

_____

[6] This statement by the trial court appears to be inaccurate. Based on the order from the October 17, 2023 shelter care/detention hearing and the May 10, 2023 delinquency petition, J.H. lived with his mother in Philadelphia at the time of his arrest. *See* Delinquency Petition, 5/10/23; Adjudicatory/Dispositional Order, 10/17/23. The record does not reflect any change in address for mother, but supervision was transferred to New Jersey when J.H. was released to mother's care on July 11, 2024. *See* Adjudicatory/Dispositional Order, 7/11/24.

an electric bike. Now it comes clear to me. He was probably running drug errands for people in Kensington." *Id.* at 15–16. Presumably addressing J.H., the court said, "Don't shake your head. I know what you're doing." *Id.* at 16. J.H. apologized. *See id.* The court continued, "Riding his electric bike to get around to pass off all that fentanyl or trank or crank." *Id.* Counsel for J.H. noted that Officer Adams recommended putting J.H. on GPS monitoring, and the court said, "So he could roam around and not go to school for another year. He's going to school. He's going to be co[m]mitted to Forestry." *Id.* At that time, the hearing concluded. The trial court subsequently entered orders adjudicating J.H. delinquent and placing him in a residential facility, with probation to refer him to Youth Forestry Camp.

On November 17, 2025, J.H. filed a timely post-dispositional motion, pursuant to Pa.R.J.C.P. 620 and 42 Pa.C.S.A. § 5505, which the trial court denied on November 19, 2025. On December 18, 2025, J.H. filed timely notices of appeal and simultaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).[7] He presents the following issues for our review:

> A. Did the juvenile court violate the Due Process Clauses of the Pennsylvania and United States Constitutions when it adjudicated J.H. delinquent and imposed disposition without permitting J.H. to question witnesses, present evidence[,]

---

[7] On January 15, 2026, our Court consolidated the appeals *sua sponte*. *See* Pa.R.A.P. 513.

or make argument in his defense, and where the judge was not fair and impartial?

B. Did the juvenile court violate Rule of Juvenile Court Procedure 409 and 42 Pa.C.S.[A.] § 6341 when it adjudicated J.H. delinquent without holding a complete hearing and where the evidence presented was insufficient to prove J.H. was in need of treatment, supervision, or rehabilitation?

C. Did the juvenile court violate Rule of Juvenile Court Procedure 512 and 42 Pa.C.S.[A.] §§ 6341, 6352 when it imposed a disposition without permitting J.H. to question witnesses, present evidence[,] or make argument in his defense, and without stating its reasons for committing J.H. to out-of-home placement on the record?[8]

D. Did the juvenile court violate the Juvenile Act and the Rules of Juvenile Court Procedure and abuse its discretion when it committed J.H. to out-of-home placement where that disposition was not the least restrictive disposition?

Appellant's Brief, at 2–3.[9]

In his first claim, J.H. argues the trial court violated his due process rights at his adjudicatory hearing when it prevented him from questioning witnesses, presenting evidence, and making argument. *See* Appellant's Brief, at 13–17. J.H. acknowledges the relative informality of juvenile proceedings,

_____

[8] J.H. does not expressly argue that the trial court failed to comply with Pa.R.J.C.P. 512(D), which requires a trial court to state its findings of fact and conclusions of law in open court, to be followed by a written order. Rather, he asserts there was no evidence on the record to support the trial court's conclusion that placement was a more appropriate option than a community-based alternative. *See* Appellant's Brief, at 29.

[9] In his brief, J.H. also raises a claim that the trial court violated his due process rights by not acting as a fair and impartial tribunal. *See* Appellant's Brief, at 18–21. As the Commonwealth correctly observes, this issue was not raised in his Rule 1925(b) statement and is, therefore, waived. *See* Appellee's Brief, at 17–19.

including adjudicatory hearings, but asserts that due process nonetheless entitles juveniles to nearly all constitutional protections afforded to an adult criminal defendant. *See id.* at 13–14. Thus, juveniles have a due process right to confront and cross-examine witnesses and, J.H. contends, the trial court prevented him from doing so. *See id.* at 14–15. Specifically, J.H. claims the court asked him and Officer Adams its own questions, did not swear them in, and did not allow the attorneys to question or cross-examine them. *See id.* at 14–16. J.H. argues the court did not permit him to finish his answers, clarify his statements, or respond to its characterizations of his answers, and the court did not question Officer Adams until after it had already made its decision. *See id.* at 14–16. Furthermore, J.H. asserts that the court did not allow his attorney to speak on his behalf—directing her not to say "if I may," telling her this was a "no-argue room," and responding to her request to hear from Officer Adams with a directive to "fill out the form." *See id.* at 16–17.

Due process "is a question of law[,] for which the standard of review is de novo and the scope of review is plenary." *Interest of K.G.-B.*, 354 A.3d 1, 8 (Pa. Super. 2026), quoting *Commonwealth v. Tejada*, 161 A.3d 313, 317 (Pa. Super. 2017).

Before we consider J.H.'s due process claim on its merits, we address the Commonwealth's argument that J.H. waived the claim by failing to object

during the hearing.[10]  *See* Appellee's Brief, at 13–16.  The Commonwealth correctly states that, to preserve an issue regarding courtroom procedure, counsel "must specifically request the trial judge to take action to remedy the situation," lest they waive the issue on appeal.  *See* Appellee's Brief, at 13 (internal alterations omitted), quoting *Commonwealth v. Strunk*, 953 A.2d 577, 581 (Pa. Super. 2008).  Thus, we must decide whether J.H. indeed requested, and was denied, the opportunity to present testimony, enter evidence, cross-examine witnesses, and make argument.

Upon close examination, we believe the record reflects that, though J.H.'s attorney did not explicitly request to put on witnesses or cross-examine J.H. or Officer Adams after the trial court questioned them, her efforts to be heard, which were interrupted and summarily dismissed by the court, were sufficient to preserve J.H.'s due process claim.  Specifically, during the court's questioning of J.H., counsel said, "If I may," and the court interrupted, "No. You're not going to say [']if I may.[']"[11]  N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 5.  Immediately thereafter, counsel again said, "Judge?" and the court responded. "No.  First of all, he'll be adjudicated delinquent. Get the [post-dispositional colloquy] form[.]"  *Id.* at 6.  Counsel began to address some of the court's questions, to which the court responded, first,

_____

[10] Notably, the trial court did not assert that J.H. waived the issue and addressed his claims on the merits.

[11] In contrast, when the Commonwealth later said, "Your Honor, if I may?," the trial court allowed the Commonwealth's attorney to speak.  N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 8.

"This is a no-argue room," and, a few moments later, "Fill the forms out, counsel. I'm directing you to fill out the forms right now." *Id.* at 6–7. At that point, counsel said, "I would just ask that you hear the probation officer," to which the court responded, "Fill the form out. He'll be adjudicated delinquent." *Id.* at 7. A few moments later, counsel said, "I would just ask to be heard," and was told to "[f]ill out the form." *Id.*

Though the trial court did not foreclose all opportunities for **argument**, it was not unreasonable for J.H.'s attorney to believe, based on the above statements by the court, that further efforts to introduce **evidence** would be futile. Because counsel never got further than "[i]f I may" during the court's questioning of J.H., or "I would just ask that you hear from the probation officer," later in the hearing, we cannot know what request J.H., through counsel, might have made if allowed to continue. In both instances, it was plausible, and even likely, that counsel intended to ask to call either, or both, J.H. or Officer Adams as witnesses, or to cross-examine them after the court's questions. Moreover, because the court questioned both J.H. and Officer Adams intermittently throughout the hearing, rather than calling them to testify formally, counsel could reasonably have struggled to identify the right moment to request cross-examination. Consequently, we cannot find J.H. waived his due process claim.[12] *See, e.g.*, *Commonwealth v. Dickson*, 918

_____

[12] While we conclude that counsel's efforts were sufficient, under the circumstances, to avoid waiving J.H.'s due process claim, we observe that
*(Footnote Continued Next Page)*

A.2d 95, 99–100 (Pa. 2007) (where trial court cut off attorney's argument, fact that attorney did not fully articulate issue raised on appeal did not waive claim for failure to develop it below; appellate court cannot know whether attorney "did not entirely appreciate the issue," or was simply cut off and "declin[ed] to resist the trial court's unequivocal effort to cut off conversation"). Thus, we proceed to consider J.H.'s argument on the merits.

While delinquency proceedings may be conducted more informally than adult criminal cases, juveniles are nonetheless entitled to due process during adjudicatory hearings, which includes, *inter alia*, the right to confront and cross-examine witnesses. **Commonwealth v. Lee**, 260 A.3d 208, 215 (Pa. Super. 2021); **see also Application of Gault**, 387 U.S. 1, 30 (1967). "[P]rocedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." **S.T. v. R.W.**, 192 A.3d 1155, 1161 (Pa. Super. 2018) (quotation marks and citation omitted). "[T]he in-court presentation of evidence is a fundamental component of due process. In

---

counsel nonetheless had an obligation to advocate for her client fully and zealously, even in the face of a trial court clearly hostile to her argument. In a perfect world, counsel would have, more vociferously and specifically, requested an opportunity to introduce evidence and question and cross-examine witnesses. However, we are cognizant of the power dynamics in a courtroom and acknowledge that attorneys and trial judges do not stand on equal footing. Thus, the trial court has the greater duty to ensure fairness and proper procedure in the courtroom. In light of counsel's efforts and the trial court's responses, we believe a decision on the merits is appropriate in this case.

almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." ***Interest of S.L.***, 202 A.3d 723, 729 (Pa. Super. 2019) (alteration and citation omitted); ***see also Hall v. Luick***, 461 A.2d 248, 250 (Pa. Super. 1983), quoting ***Goldberg v. Kelly***, 397 US. 254, 269 (1970).

The trial court offered the following response to J.H.'s due process challenge to the adjudicatory phase of the hearing:

> The record reflects that the [j]uvenile, through counsel, was given ample opportunity to present arguments, question participants (including the probation officer), and address the [c]ourt during the November 7, 2025 hearing. Defense counsel advocated for release, highlighted compliance history, and objected to adjudication, all of which were considered but overruled based on the [j]uvenile's non-compliance and risks, including no school attendance for a year. No formal witnesses were necessary, as the hearing relied on uncontested reports and admissions, consistent with juvenile procedure. This satisfied due process under the U.S. and Pennsylvania Constitutions, which require notice and an opportunity to be heard in juvenile matters, not a full adversarial trial absent contested facts.

Trial Court Opinion, 1/28/26, at 6 (internal citations omitted).

The trial court's generous interpretation of the process afforded to J.H. is not borne out by the record. Before either party had the opportunity to speak or begin to present its case, the court immediately began to question J.H. directly. ***See*** N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 3. J.H.'s attorney was never permitted to question either J.H. or Officer Adams, nor was the Commonwealth, though both explicitly asked that the court "hear from" Officer Adams. ***See id.*** at 7, 8. The court repeatedly cut off J.H. mid-

sentence while questioning him, denied J.H.'s attorney's request to speak during that questioning, and denied Officer Adams' request to speak when she asked, "Your Honor, if I may though?" ***See id.*** at 3–5, 9. The court told J.H. to stop shaking his head as it accused him of "running drug errands for people in Kensington," an unwarranted inference the court made solely based on the location at which J.H. was apprehended on his bench warrant. ***See id.*** at 15–16.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and **in a meaningful manner**." ***Mathews v. Eldridge***, 424 U.S. 319, 333 (1976) (emphasis added; internal quotation marks and citation omitted). We agree with the trial court that this does not mean due process requires "a full adversarial trial" in a delinquency matter. However, even in relatively informal juvenile proceedings, due process demands that parties be permitted to question witnesses, and witnesses be permitted to answer questions unless those questions or answers are legally objectionable. ***See, e.g.***, ***Interest of K.B.***, 331 A.3d 50, 62 (Pa. Super. 2025) (trial court violated children and youth agency's due process rights at dependency adjudicatory hearing, where it, "often acting *sua sponte* and without any basis in law, arbitrarily and capriciously excluded relevant evidence, interrupted [the agency]'s witnesses' testimony, unnecessarily continued the proceedings, then refused to listen to further testimony at the continued proceedings, and informed counsel for the child and parents that cross-examination was unnecessary"); ***In re Donna H.***, 602 A.2d 1382,

1384–85 (Pa. Super. 1992) (agency's and child's due process rights violated in dependency hearing when trial court questioned two individuals but did not allow counsel to cross-examine them, and refused to allow counsel for child to introduce testimony or call witnesses; in so doing, court "did not give counsel for [agency and child] an opportunity to present their case and evidence and did not perform a comprehensive and searching inquiry") (internal quotation marks omitted).

Due process is not an end in itself; rather, it is fundamental to the truth-seeking process in judicial proceedings. As the United States Supreme Court reflected in *Gault*, *supra*, "[f]ailure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy." *Id.* 387 U.S. at 19–20; *see also Commonwealth v. Johnson*, 234 A.2d 9, 14–15 (Pa. Super. 1967). Procedural practices that comport with due process "are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data." *Gault*, 387 U.S. at 21.

The potential pitfalls of failing to meet the standards for due process, which *Gault* so presciently anticipated, are on full display in the instant matter. The trial court gave counsel and participants little, if any, opportunity

to develop a record upon which the court might reasonably have decided the case.  As such, we find the evidence was murky, at best, and, at worst, entirely absent.   The  trial  court's  often  unsupported,  and  sometimes  erroneous, findings and conclusions rely almost entirely on inferences and deductions,  or are simply inaccurate.  *See, e.g.*, *In re K.J.*, 27 A.3d 236, 241 (Pa. Super. 2013) (appellate court defers to trial court's findings of fact, but not to its inferences, deductions, and conclusions).  For instance, the trial court claimed J.H.'s "actual living situation" was in dispute, and there were "inconsistencies" in J.H.'s account of his whereabouts.  Trial Court Opinion, 1/28/26, at 3. However, the evidence reveals no disputes or inconsistencies.  J.H.'s attorney and Officer Adams both clearly stated J.H. was living in Philadelphia after he left his mother's home in New Jersey, and there was no statement by any participant or attorney to the contrary.  *See* N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 6–8, 13–14.  Moreover, to the extent the court felt it needed additional information from J.H. to clarify his whereabouts, it denied itself that opportunity by repeatedly interrupting J.H.'s attempts to explain. *Id.* at 3–5.  Similarly, while the trial court relied heavily upon J.H.'s school attendance, or lack thereof, to explain its decision, the information the court elicited about his school enrollment and attendance did not establish a clear timeline.[13]   Finally,  in  addition  to  the  trial  court's  unsupported  findings

_____

[13] Initially, Officer Adams said J.H. stopped attending school when he disappeared, which was in April 2025, but when the trial court said in response
*(Footnote Continued Next Page)*

- 18 -

regarding J.H.'s whereabouts and schooling, the court extrapolated, solely from representations made about the location J.H. was apprehended, that J.H. was selling drugs. **See id.** at 4, 15–16.[14] It did not otherwise support this serious accusation.

Given the lack of due process afforded J.H. at the hearing, and the trial court's unsupported conclusions, we are constrained to vacate J.H.'s orders of adjudication and disposition. On remand, we instruct the trial court to hold a

_____

that J.H. had not been to school for over one year, Officer Adams responded, "Well, 2025, because that's when he disappeared. He technically disappeared in November of 2024, correct." N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 10. However, the record reflects that J.H. did **not** disappear in November 2024. He was released to his mother's care in July 2024 on GPS monitoring, and the court held review hearings on August 26, 2024, September 13, 2024, October 15, 2024, January 31, 2025, and March 3, 2025, during which time it appears J.H. remained with his mother. None of the orders from this period reflect any concerns about school. In fact, the September 2024 order states that GPS monitoring could be discharged with proof of school, and it was discharged retroactively at the October 2024 court date, presumably because J.H. met this condition. J.H. was not reported missing until April 2025. **See** Adjudicatory/Dispositional Order, 8/26/24; **id.**, 9/13/24; **id.**, 10/15/24; **id.**, 1/31/25; **id.**, 3/3/25. At the November 7, 2025 hearing, Officer Adams said only that J.H. was not **currently** enrolled in school, which might have referred only to the present school year, during which he was residing in Philadelphia without authorization. **See** N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 9.

[14] In its opinion, the trial court backed away slightly from these accusations, not repeating the statements from the hearing that J.H. was "probably running drug errands for people in Kensington" or that he was "[r]iding his electric bike to get around to pass off all that fentanyl or trank or crank," but nonetheless saying J.H. was "apprehended at . . . a known high-drug-activity corner," and characterizing J.H.'s conduct as "risky behavior in drug-infested areas." N.T. Adjudicatory/Dispositional Hearing, 11/7/25, at 15–16; Trial Court Opinion, 1/28/26, at 3, 4.

full adjudicatory hearing that conforms to the requirements of due process, the Rules of Juvenile Court Procedure, and the Juvenile Act. At this hearing, the parties should be permitted to call, question, and cross-examine witnesses, and the trial court is to permit witnesses to complete their answers, unless such questions and/or answers are legally objectionable.

In light of our disposition, we need not reach J.H.'s remaining challenges. *See, e.g.*, *Interest of N.M.*, 311 A.3d 1149, 1153 (Pa. Super. 2024). However, if J.H. is adjudicated delinquent upon remand, we remind the trial court that Pa.R.J.C.P. 512 applies to the dispositional phase of the hearing; thus, at the dispositional phase, the court "**shall** receive any oral or written evidence from both parties and the juvenile probation officer that is helpful in determining disposition," and "[b]efore deciding disposition, the court **shall** give the juvenile and the victim an opportunity to be heard." Pa.R.J.C.P. 512(A)(1) and (2) (emphasis added).

Dispositional Orders vacated. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/23/2026